UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROBERT FISCHER, JR., ) | CASE NO. 5:16CV460 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | GEORGE J. LIMBERT |
| ) | |
| NANCY A. BERRYHILL[1], ) | |
| ACTING COMMISSIONER OF SOCIAL ) | MEMORANDUM OPINION |
| SECURITY ADMINISTRATION, ) | AND ORDER |
| ) | |
| Defendant. ) | |

Plaintiff Robert Fischer, Jr. ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that: (1) the administrative law judge ("ALJ") failed to include Plaintiff's need for supplemental oxygen in his residual functional capacity ("RFC") finding; and (2) the ALJ failed to adequately evaluate Plaintiff's credibility. ECF Dkt. #12.

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.

**I.      FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on September 21, 2012 and an application for SSI on October 29, 2012. ECF Dkt. #9 ("Tr.") at 163-170.[2] He alleged disability beginning June 7, 2011 due to spinal injuries, severe sleep apnea and loss of feeling. *Id.* at 163, 197. The Social Security Administration ("SSA") denied his applications initially and upon reconsideration. *Id.* at 118-139.

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

Plaintiff requested a hearing before an ALJ, and the hearing was held on October 16, 2014. *Id*. at 41. On November 3, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Tr. at 15-35. On February 26, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on June 20, 2016 and Defendant filed her merits brief on August 18, 2016. ECF Dkt. #s 12, 14. Plaintiff filed a reply brief on August 26, 2016. ECF Dkt. #15.

## II.  RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.  Relevant Medical Evidence

Since Plaintiff limits his first claim of error to his use of supplemental oxygen, the Court addresses the medical evidence relating only to this issue in this Section. ECF Dkt. #12 at 11. Plaintiff's second claim of error relates to his testimony and credibility, for which the Court will review the testimonial or other relevant evidence in the Law and Analysis Section.

In June of 2011, Plaintiff presented to the emergency room complaining of atypical chest pain and the inability to stay awake. Tr. at 254. It was noted that Plaintiff had a history of a motor vehicle accident and was status post C5-C7 fusion many years ago, and he had gained a significant amount of weight since then and had hypertension and diabetes. *Id.* at 324. Plaintiff said that he had not been sleeping well and he fell asleep at work on two occasions. *Id*. Plaintiff reported that he lost consciousness and slept for an hour. *Id*. He also indicated that he fell asleep while driving. *Id.* Plaintiff was hospitalized from June 3, 2011 until June 6, 2011. *Id.* at 254. His pulse oximetry measured 96% on room air. *Id*. at 325. The emergency room doctor noted that Plaintiff's complaints seemed to be consistent with sleep apnea. *Id*. at 254. His vital signs were stable and an EKG and cardiac enzymes were normal. *Id*. He was started on a CPAP, but did not tolerate it during his hospitalization. *Id.* A consultation for obstructive sleep apnea ("OSA") showed that Plaintiff likely had severe OSA and possible obesity hypoventilation syndrome. *Id*. at 328. He was given a prescription for a BiPAP after a sleep study. *Id.* He was diagnosed with atypical chest pain with a negative workup, morbid obesity, new onset diabetes, and probable severe OSA. *Id*. He was told to quit smoking and to lose weight. *Id.*

On August 29, 2011, Plaintiff followed up with Dr. Krauza, M.D. of Respiratory, Critical Care and Sleep Associates. Tr. at 362. Dr. Krauza noted that June 22, 2011 polysomnogram results showed that Plaintiff had a low pulse oxygen level of 61% and total sleep time of 131 minutes. *Id.* Dr. Krauza also noted Plaintiff's complaints of shortness of breath and chronic insomnia. *Id*. His pulse oxygen level rose to 93%. *Id.* Dr. Krauza diagnosed Plaintiff with severe OSA, insomnia, not otherwise specified, dyspnea on exertion, and risk for pulmonary hypertension. *Id*. at 361. He started Plaintiff on CPAP, ordered pulmonary function testing, and counseled Plaintiff on smoking cessaition and weight reduction. *Id.*

Pulmonary function testing dated September 12, 2011 showed borderline restrictive ventilatory defect, hypoxemia without desaturation, significant response to aerosolized bronchodilators, and mildly reduced maximal voluntary ventilation. Tr. at 365.

January 4, 2013 emergency room records show that Plaintiff presented for back pain after he slipped and fell in a parking lot. Tr. at 397. Physical examination indicated clear lungs, but a slight forced expiratory wheeze. *Id.* at 398.

Plaintiff presented for a new patient consult on January 15, 2013 with Dr. Shih. Tr. at 446. Physical examination showed that Plaintiff lungs were clear, but he had wheezes, good air exchange, no increased work of breathing, and no rhonchi or crackles. *Id.* at 447.

March 2, 2013 hospital records indicate that Plaintiff presented to the emergency room on February 28, 2013 with dypsnea and chest heaviness. Tr. at 433, 451, 715. It was noted that Plaintiff was not compliant with his CPAP even though he indicated that he had used it all day the day prior to his emergency room visit. *Id*. He was found to be hypoxic on room air with wheezing, but there were no acute findings on chest x-rays. *Id.* He was admitted to the hospital after he was 93% on room air with nebulizer treatment and 88% on room air during respiratory therapy. *Id*. at 473. He was diagnosed with acute exacerbation of chronic obstructive pulmonary disease ("COPD") and treated with steroids, bronchodilators and antibiotics. *Id.* at 434-435. It was noted that once Plaintiff treated with these medications, he would no longer need supplemental oxygen. *Id*. at 435. Plaintiff agreed to a smoking cessation program. *Id*. at 453.

March 6, 2013 progress notes indicate that Plaintiff followed up for his respiratory problems and his condition was overall improved. Tr. at 431. He indicated that he was using oxygen 3-4 times pre day for 30 to 60 minutes in addition to the CPAP at night, and he was using Albuterol 3-4 times per day. *Id*. General physical examination showed clear lungs, no wheezes, rales or rhonchi and regular breathing rate and effort. *Id*. at 432. He was diagnosed with COPD with acute exacerbation, diabetes mellitus type 2, depression, and hypertension. *Id*. The plan was to start portable oxygen with a lifetime prescription and he was told to continue his medications and aerosols. *Id*. at 432.

March 9, 2013 progress notes show that he had recent antibiotic and steroid prescriptions for exacerbation of COPD. Tr. at 429. He complained of no shortness of breath, and had no chest pain, wheezing, rales or rhonchi. *Id*. at 429-430. He indicated that the new COPD regimen was helping to improve with his cough. *Id*. His COPD exacerbation was reported as resolved. *Id*. at 430. Plaintiff was thereafter referred to the pulmonary rehabilitation program for pulmonary therapy and physical therapy. *Id*. at 659.

April 5, 2013 pulmonary function studies showed reduced FEV-1, forced vital capacity, with normal ratio, FEV-1 was 72% of predicted, which suggested restrictive defect. Tr. at 564. A lung volume measurement was recommended. *Id*.

Dr. Shih's progress notes of August 30, 2013, noted Plaintiff's presentation for follow up of his abdominal pain and feeling that he was going to pass out. Tr. at 790. Dr. Shih noted Plaintiff's report that his home pulse oximetry machine dipped down to 82% and would stay there for 2-3 minutes and then rise. *Id*. Plaintiff reported that after he ate, his pulse oximetry would go down and he was short of breath all of the time over the past 3-4 months. *Id*. Plaintiff indicated that he was using his inhaler 2-3 times per week, but it was not helping. *Id*. Plaintiff's pulse oximetry was 88% on room air and 100% with nebulizers. *Id*. His lungs were clear, with a wheeze in the bilateral lower lung with forced expiration only and no crackles or rhonchi. *Id*. at 791. Dr. Shih diagnosed dyspnea/shortness of breath, abdominal pain, diabetes mellitus type II uncontrolled, COPD, hypertension and reflux. *Id*. Dr. Shih had Plaintiff go to the emergency room to have a chest and breathing evaluation to determine whether Plaintiff had heart failure or COPD exacerbation. *Id*.

August 30, 2013 medical records show that Plaintiff presented to the emergency room for shortness of breath and chest pain that had been intermittent and worsening over the past few weeks. Tr. at 665. Physical examination noted mild increased respirator effort, diffuse expiratory wheezing and no chest wall tenderness. *Id*. His oxygen level was 98%. *Id.* Chest x-rays showed no evidence of pulmonary embolism, but did show peripheral lobe nodules that were likely benign and an enlarged fatty liver. *Id.* Breathing treatments were administered and Plaintiff still complained of shortness of breath. *Id.* Plaintiff and his family doctor were comfortable discharging Plaintiff to home with close follow up on an outpatient basis. *Id*. He was diagnosed with dyspnea, chest pain, and history of OSA and COPD. *Id.* at 666.

On November 20, 2013, Plaintiff presented to Dr. Shih and reported that he had become more compliant with his medications and his CPAP machine. Tr. at 809. He complained of a productive cough and shortness of breath going up a flight of stairs, but he stated that it was no worse than usual. *Id*. He denied chest pain or pressure. *Id.* Physical examination indicated that Plaintiff's lungs were clear and his breathing was regular. *Id*. at 810.

On January 17, 2014, Plaintiff underwent a functional capacity assessment at Summa Health System with Occupational Therapist Little. Tr. at 846-857. Ms. Little opined that Plaintiff had functional limitations and medical issues that prevented him from returning to work at that time despite his over-guarding, self-limiting behavior, and inconsistent efforts in the strength and endurance tests. *Id.* She indicated that Plaintiff could not stoop, squat, crouch, lift from floor to knuckle or floor to waist, he had difficulty performing some overhead tasks, and he had shortness of breath when lifting, even though his Sp02 levels never dropped below 93% while going up and down stairs during the evaluation. *Id.* She noted that Plaintiff reported that he could not sit or stand for longer than 60-90 minutes or walk for longer than 20-30 minutes. *Id*.

Plaintiff presented to Dr. Shih on March 20, 2014 for a checkup and to review his blood test results. Tr. at 802. Plaintiff was complaining of feeling stressed at work as his family owned a laundromat and auto shop and many responsibilities were placed on him in the past week. *Id.*

On April 6, 2014, Plaintiff presented to the emergency room with chest pain, explaining that he developed the chest pain in the middle of having intercourse and then after he got up, he felt like

he was going to pass out and he felt nauseous and short of breath. Tr. at 823. He indicated that he had COPD. *Id*. Plaintiff's pulse oximetry was 92% on room air and chest x-rays showed normal lungs. *Id.* at 824-828.

On April 29, 2014, Plaintiff presented to the emergency room with dental pain over the last week. Tr. at 818. Physical examination showed his pulse oximetry at 96% on room air, but his lungs were clear with no wheezes, rales or bronchi. *Id.* at 816. Poor dentition was noted with no signs of abscess, infection, or swelling. *Id.* Based upon the examination, no additional workup was necessary and Plaintiff was diagnosed with dental pain, told to follow up at the dental clinic, and he was given pain medication and an antibiotic. *Id.*

### B.      **Relevant Testimonial Evidence**

At the ALJ hearing, Plaintiff testified that he was 5'8" tall and weighed 345 pounds. Tr. at 47. He had his GED and his driver's license. *Id*. He lives with his 67 year-old mother who needs help caring for herself. *Id*. at 48. Plaintiff indicated that his mother has medical problems and he keeps an eye on her, cooks for her, takes out the garbage, and takes her to her medical appointments. *Id.* He identified his medications, including Albuterol and Spiriva, as well as the CPAP he wears at night. *Id*. at 49. He indicated that he takes an IBS medication, depression medication, a muscle relaxer, and blood pressure medication. *Id*. Plaintiff testified that his medications cause him to be tired and nauseous, and he has diarrhea 10 times a day. *Id*. at 50.

When asked where his pain was located, Plaintiff said he had pain in his neck, between his shoulder blades, his lower back, his left knee and ankle, and sometimes his right ankle. Tr. at 50. He indicated that his lower back and neck pain were the worst as they were constant pains, while his knee pain would come and go with the amount of time he was on his feet. *Id*. at 50-51. Plaintiff estimated that he could walk five to ten minutes before he would have to stop due to running out of breath and experiencing back spasms. *Id.* at 51. He also has problems sitting in that if he sits for over twenty minutes, he cannot get up or move and he gets really sore. *Id*. Plaintiff explained that he has to walk up a flight of stairs to get to his apartment. *Id*.at 52.

Plaintiff testified that his medication helps his back spasms but the actual bone pain is always there. Tr. at 52. The ALJ asked about other measures to try to alleviate the pain and Plaintiff

indicated that he took hot showers, used heating pads and ice pads, and stretched and tried meditation. *Id*. He explained that his doctors had sent him to physical therapy three times to try to alleviate the need for back surgery, but the more he participated in physical therapy, the worse he felt. *Id*. at 52-53. Plaintiff testified that the pain interfered with his ability to sleep as he slept two hours at a time before he would awaken, toss, turn, and go to the bathroom. *Id*. at 52.

When asked about his diabetes, Plaintiff responded that it was still not under control and he was working with a new doctor. Tr. at 54. He indicated that when his blood sugar gets too high, which happens about 10 to 15 times per month, he gets sick to his stomach and becomes nauseated and dizzy. *Id*. He also indicated that his blood pressure was not stabilized yet and he gets throbbing headaches 10 to 12 times per month when his blood pressure gets too high. *Id*. at 56. He lays down and puts on his oxygen when this happens. *Id.*

When asked about his COPD, Plaintiff explained that he had COPD and asthma and "just occasionally" he has to use his portable oxygen when he goes out for long periods of time. Tr. at 54. He indicated that in addition to physical activity, chemical smells and seasonal changes impact his breathing. *Id*. at 54-55. He testified that it takes him about an hour after experiencing shortness of breath to get re-engaged in a physical activity. *Id*. at 60. He explained that when this happens, he usually leans up against something and concentrates on his breathing, or he uses his portable oxygen. *Id*. Plaintiff explained that he used the portable oxygen twice a week on a weekly basis for an hour or two until his breathing calmed down or he checked his pulse ox. *Id*. at 61. He further testified that about 8 to 10 times per month, he has bad breathing days where gets short of breath even with no physical exertion and he uses his oxygen machine. *Id*. at 62. Plaintiff also stated that after the shortness of breath and using his oxygen machine, he rests for the rest of the day and sometimes falls asleep. *Id.* He has tried exerting himself after a breathing episode followed by oxygen and he had to go back on the oxygen again. *Id.* at 63.

The ALJ then questioned the vocational expert ("VE.") Tr. at 65. He asked the VE to consider a hypothetical person with the same age, education and work experience as Plaintiff with an ability to lift, carry, push and pull up to 10 pounds occasionally and five pounds frequently, sit for six hours, and stand/walk for up to two hours in a normal workday; with no climbing of ladders,

ropes or scaffolds; occasionally climbing ramps and stairs; occasionally stooping and crouching; no kneeling or crawling; no driving commercially; avoidance of workplace hazards such as unprotected heights or exposure to dangerous moving machinery; and avoidance of concentrated exposure to dusts, fumes, gases, odors and poorly ventilated areas. *Id*. at 67. The VE testified that such a hypothetical individual could perform sedentary jobs in the regional and national economy, such as final assembler, order clerk, and electronics inspector. *Id*. at 67-68.

The ALJ modified his hypothetical individual to include four additional 15-minute breaks throughout the workday at unannounced times. Tr. at 69. The VE testified that no jobs would be available for such a person. *Id*. The VE also responded that no jobs would be available for the hypothetical individual who required three additional 15-minute breaks or two additional 15-minute breaks. *Id*.

The ALJ modified his hypothetical individual again to have all of the same limitations as his first hypothetical individual, but he also required unannounced 30-minute breaks twice per week for the entire employment period in addition to the normal breaks. Tr. at 70. The VE testified that an employer would tolerate this limitation. *Id*.

The ALJ again modified the hypothetical individual, going back to the first hypothetical individual and adding the absence from work one day per week. Tr. at 71. The VE responded that no jobs would be available as normal absenteeism tolerated by employers was no more than twice per month. *Id*.

Plaintiff's counsel asked the VE to presume the ALJ's hypothetical individual that included the unannounced 30-minute breaks twice per week and add that the individual would also need to use his portable oxygen tank on those 30-minute breaks. Tr. at 72. The VE testified that the use of the portable oxygen alone would require an employer's accommodation and these two limitations would eliminate all competitive employment. *Id.*

### III. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In his November 3, 2014 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, and he had the following severe impairments: OSA; obesity, COPD; degenerative disc disease ("DDD"); diverticulitis; diabetes mellitus; and

hypertension.  Tr. at 17-19.  Following an analysis of Plaintiff's severe impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1.  *Id.* at 19-20.  After considering the record, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except that Plaintiff could never climb ladders, ropes or scaffolds, never kneel or crawl, and could occasionally climb ramps or stairs and stoop and crouch.  *Id.* at 20.  The ALJ further found that Plaintiff must avoid all workplace hazards, such as unprotected heights and dangerous moving machinery, he had to avoid concentrated exposure to dusts, fumes, gases, odors, and poorly ventilated areas; and he could not engage in commercial driving.  *Id.*

Next, the ALJ found that Plaintiff was unable to perform any past relevant work.  Tr. at 33.  Considering Plaintiff's age, education, work experience, the RFC and the vocational expert's ("VE") testimony, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  *Id.*  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB or SSI.  *Id.*

## IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI. LAW AND ANALYSIS

### A. RFC, Social Security Ruling ("SSR") 96-8p and Supplemental Oxygen

Plaintiff asserts that the ALJ failed to include the use of supplemental oxygen in his RFC and he failed to adequately articulate why he did not include this limitation in violation of SSR 96-8p. ECF Dkt. #12 at 11-15. Plaintiff claims that the ALJ agreed that he needed supplemental oxygen and the VE testified that if Plaintiff needed oxygen even 3 times per month, he would be entitled to social security benefits. *Id.* at 12.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. §§ 404.1545(a)(2)(3), 416.945(a)(2)(3). The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.

SSR 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.*

In the instant case, Plaintiff asserts that while the ALJ agreed that Plaintiff needed supplemental oxygen, he failed to include this medical need in Plaintiff's RFC and he failed to explain why he did not include it in the RFC. ECF Dkt. #12 at 11-13. Plaintiff cites to *Barnwell v. Colvin*, Case No. 4:13cv00019, 2014 WL 3890442, at *16 (W.D. Virg. Aug. 7, 2014) in support. *Id.* at 13. Defendant counters that the ALJ properly omitted the need for supplemental oxygen in

-11-

the RFC because the medical evidence of record showed that Plaintiff was not as dependent upon supplemental oxygen as he alleged. ECF Dkt. #14 at 7. Defendant also distinguishes *Barnwell* from the instant case. *Id*. at 8.

The Court finds that the ALJ sufficiently addressed Plaintiff's use of supplemental oxygen and substantial evidence supports his decision to not include the use of supplemental oxygen in his RFC for Plaintiff. The ALJ provided a thorough review of Plaintiff's respiratory impairments and his use of portable oxygen. Tr. at 20-32. He noted Plaintiff's testimony that Plaintiff had been using portable oxygen for two years, he tested his pulse oxygen levels and used oxygen when the levels were lower and he required rest after using the oxygen. *Id.* at 21. The ALJ noted that Plaintiff reported bad breathing days even on some days when he did not exert himself. *Id.* The ALJ cited to various medical reports concerning Plaintiff's oxygen saturation levels, such as his emergency room visit in June of 2011 where he was admitted for chest pain with pulse oxygen saturation levels from 96-98%. *Id.* at 22. The ALJ noted Plaintiff's June 22, 2011 polysomnogram results showing severe OSA with snoring, sleep apnea, oxygen desaturation, and severe hypoxemia with a base oxygen saturation level of 83% and oxygen saturation as low as 61%. *Id*. at 23, citing Tr. at 381. He noted that supplemental oxygen and weight loss were recommended. *Id*. at 23.

The ALJ further noted Plaintiff's treatment with Dr. Krauza for his complaints of shortness of breath and a significant response to aerosolized bronchodilators at a pulmonary function test. Tr. at 23, citing Tr. at 361-373. He cited to medical examinations noting positive wheezes and a February 28, 2013 emergency room treatment for chest pain where Plaintiff was found to be hypoxic on room air with wheezing and he was given aerosols and oxygen. *Id*. at 24, citing Tr. at 439-442, 456-499. The ALJ referred to the March 6, 2013 statement by Plaintiff to his primary care doctor that he was using oxygen three to four times per day for thirty to sixty minutes, Albuterol three to four times per day, and his CPAP nightly. *Id*. at 24, citing Tr. at 430-431. The ALJ indicated that Plaintiff was prescribed a handicap placard and given a prescription for lifetime portable oxygen. *Id*. at 25, citing Tr. at 432. However, the ALJ also noted that Plaintiff's primary care doctor indicated Plaintiff's overall improvement in status on that date. *Id.* at 24, citing Tr. at 431-432.

The ALJ further cited to August 30, 2013 medical records showing that Plaintiff complained to his primary care doctor of constant shortness of breath with home pulse oxygen readings down to 82% for two to three minutes then rising, and no relief with using an inhaler two or three times per week. Tr. at 27, citing Tr. at 790-792. Plaintiff had a pulse oxygen saturation rate of 88% on room air, but it increased to 100% with oxygen and a physical examination showed clear lungs with no crackles or rhonchi. *Id*. He was nevertheless instructed to go the emergency room where he was diagnosed with dyspnea, a history of COPD and OSA and discharged to home. *Id*.

In his RFC for Plaintiff, the ALJ indicated that he was limiting Plaintiff to sedentary work due in part to Plaintiff's breathing difficulties as a result of his OSA and COPD. Tr. at 29. He explained that despite Plaintiff's ongoing breathing difficulties, pain, and mobility issues, he was not barred from performing sedentary work with only two hours of standing and walking and six hours of sitting. *Id*. The ALJ cited to Plaintiff's January 17, 2014 functional capacity evaluation by Ms. Little, who noted that Plaintiff's oxygen saturation level never dropped below 93% when going up or down stairs. *Id.* at 28, citing Tr. at 856. In addition to limiting Plaintiff to sedentary work, the ALJ placed restrictions on Plaintiff's exposure to dusts, fumes, odors, and poorly ventilated areas based upon his breathing issues. *Id*. at 30.

Specifically concerning Plaintiff's use of portable oxygen, the ALJ noted the medical records indicating that Plaintiff required lifetime oxygen use. Tr. at 31, citing Tr. at 596. He cited to the first notation of a prescription for the lifetime portable oxygen on March 6, 2013, which clearly indicated that the portable oxygen was prescribed for nighttime use. *Id*, at 31, citing Tr. at 596. The notation stated "Start Oxygen PORTABLE,  2 L/min NC q HS, Lifetime," which means portable oxygen at 2 liters per minute ("2 L/min") via nasal cannula ("NC") every ("q"), "hours of sleep" or "bedtime" ("hs, h.s."). *Id.*; *see* http://en.wikipedia.org/wiki/List_of_medical_abbreviations. All but one reference in the medical records indicate the use of supplemental oxygen was only for nighttime use. *See* Tr. at 427, 429. 432, 583, 606, 609, 616-617, 619, 734, 822 (nurse indicated on current medication list "O2 night & exertion"), 841.

The ALJ indicated that despite the lifetime prescription for portable oxygen, records as of March 2013 showed that Plaintiff was using home oxygen only intermittently and he was not

-13-

compliant with other medical modalities and recommendation that impacted his breathing, such as the CPAP machine, diabetes and hypertension medications, smoking cessation and losing weight. Tr. at 31, citing Tr. at 432, 434, 436, 441, 444, 456-457, 589, 597-598, 600, 609, 612, 615-616, 618, 730-732. In addition, the ALJ noted that despite Plaintiff's allegations of frequent use of supplemental oxygen, recent treatment notes did not refer to its use at all, which suggested to the ALJ that Plaintiff was not as dependent upon oxygen as he alleged. Tr. at 31, citing Tr. at 427-561, 577-622, 665-811, 844-868. He cited to Dr. Shih's progress notes which on August 30, 2013 indicated that Plaintiff complained of shortness of breath and irregular pulse oximetry readings, but the only modality noted that Plaintiff used for this condition was an inhaler 2-3 times per week. *Id.* at 31, citing Tr. at 790. Dr. Shih's March 20, 2014 notes lacked any reference to portable oxygen under the listing of Plaintiff's current medications or under Plaintiff's treatment for COPD or OSA. *Id.* at 31, citing Tr. at 802-803. The only references were to Albuterol for COPD and the continuation of the CPAP for OSA. *Id.* at 804. The ALJ also cited to the physical functional capacity evaluation by Ms. Little, which under "ADL's: Assistive Devices" indicated "None." *Id.* at 31, citing Tr. at 847.

In addition, Plaintiff's counsel presented a hypothetical individual to the VE who required the use of supplemental oxygen at his worksite and the ALJ followed up on that hypothetical individual with his own modification, which shows that he considered the possibility of adding a supplemental oxygen limitation. Tr. at 72-73. The fact that the ALJ decided not to include this limitation in his RFC is within the ALJ's purview and substantial evidence supports his decision to not include the limitation.

Plaintiff cites to the Sixth Circuit case of *Howard v. Commissioner of Social Security*, 276 F.3d 235, 237 (6th Cir. 2002) in support of his case and a Virginia District Court case of *Barnwell v. Colvin*, 2014 WL 2890442 (W.D. Virginia) that he alleges is "directly on point" to the instant case. *Barnwell* is not "directly on point," as in that case, the ALJ failed to explain why he did not include an oxygen limitation in Barnwell's RFC, he failed to explain why he did not limit Barnwell to jobs that would accommodate oxygen use and he failed to find that Barnwell did not actually need to use supplemental oxygen. *Barnwell,* 2014 WL 3890442, at *16. In the instant case, the ALJ

-14-

explicitly addressed Plaintiff's use of supplemental oxygen in his decision after exploring the issue at the hearing, and he determined that Plaintiff's use of supplemental oxygen was intermittent and even undocumented in the frequency at which Plaintiff described. Tr. at 31. Moreover, the ALJ in the instant case complied with *Howard* as he adequately explained his assessment of Plaintiff's use of supplemental oxygen, explored the issue at the hearing with Plaintiff and the VE, and determined that beyond sedentary work and a restriction to environmental exposures, Plaintiff's use of supplemental oxygen did not require more. Substantial evidence, as explained above, supported that determination.

For the foregoing reasons, the Court finds that the ALJ specifically and adequately addressed Plaintiff's use of supplemental oxygen and substantial evidence supports his decision to not include additional limitations relating to the use of oxygen in his RFC beyond a sedentary work level and environmental restrictions.

### B.     Credibility

Plaintiff also challenges the ALJ's credibility determination, asserting that the ALJ failed to adequately address his credibility because he relied upon only minor daily living activities in discounting Plaintiff's credibility. ECF Dkt. #12 at 15-17.

The social security regulations establish a two-step process for evaluating pain. See 20 C.F.R. § 404.1529, SSR 96–7p.  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and

-15-

limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. See SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997).

Upon review of the ALJ's decision in the instant case, the Court finds that the ALJ sufficiently conducted a credibility analysis that included much more than a consideration of Plaintiff's daily living activities. In his decision, the ALJ cited to the proper two-step process in evaluating Plaintiff's credibility. Tr. at 22. He determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible and were consistent with the RFC that the ALJ determined for Plaintiff. *Id.*

As Plaintiff asserts, the ALJ considered Plaintiff's testimony of his daily living activities, which included caring for his 67 year-old mother who had many medical problems, climbing a flight of stairs in order to get into their apartment, taking out the trash, and cooking dinner. Tr. at 30. However, contrary to Plaintiff's inference, the ALJ addressed much more than Plaintiff's daily living activities in assessing Plaintiff's credibility. The ALJ specifically states as much as immediately following a discussion of Plaintiff's daily living activities, he states that "[a]lthough not dispositive

of the issue of the claimant's alleged disability, this evidence nevertheless supports a finding that he is not precluded from all sustained work activity." *Id*. The ALJ reviewed Plaintiff's testimony and each of Plaintiff's impairments in detail. Tr. at 22-30. He also reviewed the various treatment modalities that Plaintiff used and underwent, including physical therapy, chiropractic treatment, a CPAP machine, portable oxygen, and chiropractic treatment. *Id*. The ALJ noted that Plaintiff was not compliant with CPAP treatment or diabetes therapy and he did not seek other treatment modalities, such as massage therapy, sustained orthopedic treatment, pain management treatment, use of a TENS unit, injection therapy, and he declined bariatric therapy. *Id.*. at 31. He also cited to the opinions of the state agency physicians and gave those opinions some weight, finding that Plaintiff was more limited than they opined. *Id*. He also indicated that he gave little weight to Ms. Little's functional capacity evaluation as she was an unacceptable medical source and she indicated in her report that Plaintiff did not put forth good effort at the evaluation. *Id*. at 31-32. In addition, the ALJ noted that he attributed little weight to the opinion of Plaintiff's mother as evidence of disability, explaining that Plaintiff's mother was not an acceptable medical source, she would have difficulty rendering an unbiased assessment, and the medical evidence did not support her opinion because the medical record contained evidence of Plaintiff's generally clear lungs and normal strength, sensation, reflexes, and gait with independent ambulation. *Id*. at 32. The ALJ also explained that he gave little weight to the issuance of a handicapped placard to Plaintiff by his primary care physician because it was based upon a different standard than the social security standards and it was also not supported by the medical evidence of record which showed Plaintiff's generally clear lungs and normal strength, sensation, reflexes, and gait with independent ambulation. *Id*. at 32.

For these reasons, the Court finds that the ALJ sufficiently applied the credibility assessment standard and substantial evidence supports his credibility determination.

## VII. CONCLUSION

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.


Date: February 22, 2017　　　　　　　　　*/s/George J. Limbert*
　　　　　　　　　　　　　　　　　　　　GEORGE J. LIMBERT
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE
-18-